IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| STATE AUTOMOBILE MUTUAL INSURANCE COMPANY | * | |
| | * | Case No.: 1:14-cv-02989-RDB |
| Plaintiff | * | |
| v. | * | |
| OLD REPUBLIC INSURANCE CO., et al. | * | |
| Defendants | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * *

**MEMORANDUM OF LAW IN SUPPORT OF CROSS-MOTION FOR
SUMMARY JUDGMENT AND RESPONSE TO MOTIONS FOR
PARTIAL SUMMARY JUDGMENT OF STATE AUTOMOBILE MUTUAL
INSURANCE COMPANY AND FIDELITY ENGEERING CORPORATION**

The Old Republic Insurance Company ("Old Republic"), Defendant, by its attorneys, Angus R. Everton and Morgan Carlo Downs & Everton P.A., hereby incorporates this Memorandum into its Cross-Motion for Summary Judgment and Response to Motions for Partial Summary Judgment of State Automobile Insurance Company and Fidelity Engineering Corporation, respectively Plaintiff and Cross-Plaintiff herein.

<u>S<small>TATEMENT OF</small> F<small>ACTS</small></u>

On or about September 3, 2013, AMCP-1, LLC filed the underlying Complaint (Document 25-2), naming as defendant the Fidelity Engineering Corporation. According to the allegations in the Complaint, AMCP-1 was a Maryland limited liability company owning certain real property in Anne Arundel County, Maryland. Fidelity was a Maryland corporation with an office in Baltimore County, Maryland, and "provided the mechanical equipment, materials and

services at issue to AMCP-1's real property in Anne Arundel County and performed its related work in Anne Arundel County."

The Complaint alleged that AMCP-1 contracted with a non-party, Hostetter Construction Corporation (now known as Holland Construction Corporation) to build a "multi-floor mixed retail/office building on [AMCP-1's] land in Arundel County."

It was alleged that in May of 2008, Hostetter (the general contractor) contracted with Fidelity Engineering pursuant to the "Contract" (Document 25-4) to provide plumbing and mechanical/HVAC portions of the building to be done on the AMCP-1 property for a contract price of approximately $1.8 Million. AMCP-1 is a third party beneficiary of this Contract, and its rights against Fidelity arise out of the terms and provisions of the Contract. According to the allegations in the Complaint, Fidelity performed this work and was paid for it by Hostetter. It is alleged that the Contract included a requirement that Fidelity, during the start of the HVAC system that "formed a part of the Work" and for a period thereafter, provide treatment of the water in the system. It is further alleged that during the spring of 2010, one of AMCP-1's retail tenants experienced a failure of pipes in the HVAC system, and Fidelity was immediately notified of this.

It is alleged that Fidelity initially reported to AMCP-1 and Hostetter that its evaluation and analysis revealed that the failure was caused by a defect in the pipes caused by the pipe manufacturer. However, "[d]uring the process of its evaluation of the pipe failure, Fidelity learned that it had failed to treat the System's water since start up and that some of the System's pipe had been damaged." Fidelity then "indicated and promised to Hostetter and [AMCP-1] that it would "fix" the pipe problems and that it would take remedial action.

2

The Complaint states that throughout the remainder of 2010, and into January 2011, Fidelity continued to promise to remedy the pipe problems, including replacing pipes that it alleged contained manufacturing defects, and by scheduling and completing a "flushing" of the System in an attempt to remove accumulated material deposited by the degraded pipes through the System.  Finally, Fidelity assured AMCP-1 and Hostetter that it had fixed the problems with the System in early 2011.

In fact, according to the allegations, Fidelity had <u>not</u> fixed the problems with the System, and ultimately AMCP-1 hired its own expert to evaluate the System, and that expert determined that "the damage affected all the pipes in the System as well as all HVAC equipment through which the untreated water had traveled," and that "AMCP now has a building with a [HVAC] System that experiences periodic failures from debris, and pipes that are now missing much of their wall thickness."

The Complaint contains three Counts:  The first Count, entitled "Promissory Estoppel" alleges generally that Fidelity promised to repair the HVAC system, but breached its promise to do so, and "the only way to fix the problem at this time is to replace all pipe and equipment in the System that has had contact with the untreated water."

The second Count of the Complaint alleges "negligence," and states that "by failing to provide water treatment to the System during start up and initial operation, Fidelity breached its duty to act reasonably," proximately causing damage to the pipes and equipment in the HVAC system.  The third Count is a count for "Breach of Contract/Warranty" stating that the contract between AMCP and Fidelity contained a "'warranty' of the quality of any work performed by Fidelity," and the Count also alleges that "Fidelity further warranted the corrective work it

performed."  The allegations are that "Fidelity has breached its contract and warranty which benefited AMCP, and AMCP has been damaged by such breach."

On March 31, 2014, AMCP-1, LLC filed an Amended Complaint (Document 25-3), but the Amended Complaint did not change the theories of liability in the three Counts; it did, however, set forth the "warranties" upon which Count III was based.

After the lawsuit was filed, Old Republic Insurance Company received notice of the suit, and a demand to share in the defense from the State Automobile Insurance Company ["State Auto"], which had retained counsel to defend Fidelity in the action.  After consulting with counsel, Old Republic denied that its policies provided coverage for the claims presented in the AMCP-1 litigation, and refused to share in the defense with State Auto.  Thereafter, State Auto filed this declaratory judgment action, including as a Defendant Fidelity Engineering Corporation, which in turn filed a Cross-Claim against Old Republic Insurance Company seeking a declaration that Old Republic was obligated to participate in its defense.  The pertinent Old Republic policy has been attached to State Auto's Motion for Partial Summary Judgment, and is Document 25-6 in the docket herein.

### THE DUTY TO DEFEND

In analyzing the duty to defend, Maryland follows a "modified eight-corners" rule; specifically:

> Under Maryland law the obligation of an insurer to defend its insured is determined by the allegations in the underlying claims against the insured.  If the plaintiffs in the underlying case "allege a claim covered by the policy, the insurer has a duty to defend."…In addition, even if the plaintiffs in the underlying case do not "allege facts which clearly bring the claim within or without the policy coverage, the insurer must still defend if there is a potentiality that the claim could be covered by the policy."…If the coverage issue depends upon policy language which is ambiguous, the court "must resolve that ambiguity in favor of the insured before it can conclude that the insurer has or had an obligation to provide a tort defense."…

4

*Harbor Court Assoc., et al. v. Kiewit Constr. Co., et al.*, 6 F.Supp.2d 449, 454 (D.Md. 1998). The "eight-corners" rule is modified to the extent that, while an insurer may not rely upon extrinsic information – that is information other than what is contained in the complaint and the policy itself – to deny a defense, an insured may produce extrinsic information making it entitled to a defense even if the facts alleged in the complaint do not set forth a potentiality of coverage. See, e.g. *Aetna Cas. & Surety Co. v. Cochran*, 337 Md. 98, 111-112, 651 A.2d 859 (1995).

On the other hand, the Maryland Court of Special Appeals has indicated that there is a limit to the "extrinsic" information factor; specifically, even if there is a <u>possibility</u> that the plaintiff could state a claim which potentially fell within policy coverage, there is no duty to defend in a situation where the plaintiff fails to allege a covered cause of action, even if the plaintiff could conceivably done so. *See Reames v. State Farm Fire & Cas. Ins. Co.*, 111 Md.App. 546, 560-561, 683 A.2d 179, 186 (1996).

I.     **The Allegations in the Complaint and the Amended Complaint do not Establish a Covered "Occurrence."**

Maryland Courts – and this Court, applying Maryland law – plainly recognize, in the context of potential commercial general liability insurance coverage for property damage, faulty workmanship in the performance of a construction or installation contract of the type involved in this action, is not considered an "occurrence" under the Commercial General Liability Coverage <u>except</u> under the circumstance where the faulty workmanship causes damage to property <u>other than</u> the property that is the subject of the insured's contractual obligation.  See, e.g. *Lords Landing Village Condo. Council of Unit Owners v. Continental Ins. Co.*, 191 F.3d 448 (Table), pp. 2-3 (4th Cir. 1999); *OneBeacon Ins. Co. v. Metro Ready-Mix, Inc.*, 242 Fed.Appx. 936, 940-941 (4th Cir. 2007); *M Consulting & Export, LLC v. Travelers Cas. Ins. Co.*, 2 F.Supp.3d 730,

738-740 (2014); *Federal Insurance Company v, Firemen's Insurance Company,* 769 F. Supp. 2d

865, 876-877 (D. Md. 2011); *Clipper Mill Federal, LLC v. The Cincinnati Ins. Co.*, 2010 WL

4117273, pp. 4-6 (D.Md. 2010); *Kauffman v. Travelers Companies*, 2010 WL 889791, pp. 5-7

(D.Md. 2010); *Lerner Corp. v. Assurance Co. of America*, 120 Md.App. 525, 707 A.2d 906

(1998); *Woodfin Equities Corp. v. Harford Mut. Ins. Co.*, 110 Md.App. 616, 678 A.2d 116, 128

(1996), *rev'd in part on other grounds*, 344 Md. 399, 687 A.2d 652 (1997).  As the Fourth

Circuit indicated in *OneBeacon*, supra, 242 F.Appx. at 941:

> In French [v. Assurance Co. of America, 448 F.3d 693 (4th Cir. 2006)], we
> explained that if a product does not meet the contract requirements of a sale, it
> should not be unforeseen that "the purchaser will be entitled to correction of the
> defect."  Where the alleged loss constitutes the remediation of the breach of
> contract itself, the incident causing loss is neither an "occurrence" nor an
> "accident," and a lawsuit to enforce and remediate the situation is not covered
> under commercial general liability policies.  This is so even if the entity being
> sued is a general contractor, and the entity causing the loss was one of the general
> contractor's subcontractors.  See, Lords Landing Village Condo Council v.
> Continental Ins. Co., *supra*.  ("Likewise, in this case, we conclude that the losses
> claimed from the failure of Wellington Homes' subcontractors to use primer
> paint, as contractually obligated, and to carry out other similar obligations were
> not 'unexpected or unforeseen.' Because the breach of duty to perform
> construction work property is not an 'accident,' as covered by a CGL policy,
> Continental Insurance owes Wellington Homes no coverage.").

This Court explained the principle in *Kauffman*, by reference to the *Lerner Corp.* case:

> In a case involving a breach of contract regarding a piece of property, the Court of
> Special Appeals of Maryland analyzed the meaning of "occurrence" as it relates
> to a contract.  In Lerner Corp. v. Assurance Co. of America, …the purchaser of a
> building claimed defects in the building's façade and made a claim for the cost of
> repairs, pursuant to the contract of sale….The Court…held that

> > If the damages suffered relate to the satisfaction of the contractual bargain,
> > it follows that they are not unforeseen.  In other words, and in the context
> > of this case, it should not be unexpected and unforeseen that if the building
> > delivered does not meet the contractual requirements of the sale, the
> > purchaser will be entitled to correction of the defect.  This, we believe,
> > would be the expectation and understanding of the reasonably prudent
> > laypurchaser of a CGL policy.

2010 WL 889791, p. 6.

_Woodfin Equities Corp. v. Harford Mut. Ins. Co._ is particularly apposite in this situation because it involved a claim significantly similar to that presented here.  The appellants (Woodfin) constructed a hotel in Rockville, Maryland and the general contractor in the construction of the hotel, Hardage Construction Company (HCC), was also a plaintiff/appellant.

The Harford Mutual Insurance Company, the appellee, issued a CGL policy to Deerfield Engineering, Inc., a mechanical subcontractor hired by the appellants to provide labor and materials and to do all things necessary for the installation and completion of the hotel's HVAC system.  110 Md.App. at 622, 678 A.2d at 118-119.

Along with the insured subcontractor, Deerfield, sub-subcontractors (Trane Company and Climate Master) were involved in the construction of the hotel.  Trane was the manufacturer of the HVAC systems that the insured installed, and Climate Master participated in the manufacturing of the HVAC units and component parts.

In January 1990, the owner and general contractor sued Trane, Climate Master, and a third entity (Deerfield, Inc.), claiming breach of contract, negligence, breach of express warranty, breach of implied warranty, breach of implied warranty of fitness for particular purpose, and strict liability, based upon allegations that 130 HVAC units in the Woodfin Hotel failed at least once, and continued to fail.[1]

From the perspective of the present case, the pertinent issue in _Woodfin_ was whether Harford Mutual's CGL policy would provide coverage to the subcontractor Deerfield Engineering for the damages sustained by Woodfin as the result of the defective HVAC system.

---

[1]      Deerfield, Inc. was improperly sued; its identification as a defendant was on the basis of a misnomer.  One of the issues before the Court, not at issue here, was the correction of this misnomer.

7

The Court of Special Appeals ultimately concluded that the replacement of the HVAC system was not a covered loss, although there was a potentiality of coverage for loss of use by the plaintiff owner of the hotel rooms themselves as the result of the failure of the HVAC system, and the necessity for replacing it.  With regard to the former issue, the Court of Special Appeals observed:

> Establishing that the HVAC system was physically injured or destroyed is only one step in the analysis under the general coverage provision.  Appellants also have to show that property damage to the HVAC system was caused by an "occurrence," i.e. an "accident, including continuous or repeated exposure to conditions, which results in …property damage neither expected nor intended from the standpoint of the insured."

110 Md.App. at 648, 678 A.2d at 131.  The Court went on to note:  "Courts uniformly hold that when the property damage arising out of the insured's defective workmanship is confined to the insured's own work product, the damage is not caused by an "occurrence" within the meaning of the CGL policy."  Id.  The Court then observed:

> Consequently, appellee [Harford Mutual] is not obligated to pay appellants for "damages because of…property damages" to the HVAC system, because such damage was not caused by an "occurrence."  Specifically, therefore, appellants may not recover for costs associated with tearing out walls, molding, and carpeting in order to repair and remove the HVAC units.  Nor may appellants recover for the costs to replace and repair the defective HVAC systems.  Similarly, appellants may not recover for the economic costs of paying consultants, or the economic costs associated with loss of management time.  Indeed, because the property damage to the HVAC systems was not caused by an occurrence, appellants are not entitled to recover any of the economic or consequential damages they may have sustained as a result of the property damage to the HVAC systems.

110 Md.App. at 649, 678 A.2d at 131-132.

Unlike the present case, however, in _Woodfin_, "[a]ppellants put forth undisputed evidence that they lost the use of guest suites as a result of the breakdown of the HVAC system."  110 Md.App. at 651, 678 A.2d at 133.  The Court held that allegations of the loss of use of these

guest rooms constituted the loss of use of tangible property, and as such, was potentially covered under the Harford policy:

> Unlike the HVAC systems, the guest rooms are not the work product of the insured, but are the property of appellants.  In other words, at least with respect to the loss of use of guest suites, the damages to property other than the product or completed work of the insured.   To the extent that the insured's defective workmanship causes damage to such other property, courts uniformly hold that such damages are caused by an "occurrence," and is, therefore, compensable under the CGL policy.

110 Md.App. at 652, 678 A.2d at 133.

In the present case, neither the Complaint nor the Amended Complaint that have been attached as exhibits to State Auto's Motion for Partial Summary Judgment contain any allegation of such "loss of use" collateral damage.  In its Motion for Partial Summary Judgment, Fidelity Engineering contends, relying upon the decision of the Maryland Court of Appeals in _Aetna Cas. & Surety Co. v. Cochran_, 337 Md. 98, 651 A.2d 859 (1995), that there is "extrinsic evidence" of such collateral damage, putatively set forth in certain answers to interrogatories provided by the Plaintiffs below.  Specifically, an answer to an interrogatory requiring the underlying plaintiff to set forth with particularity its damages, the Plaintiff gave the following answer:

> **Answer:**      All lateral pipe (with the exception of the first floor) and all vertical pipe has to be replaced, as well as the HVAC equipment itself.  Also, AMCP-1 has had to make concessions/payments to some of its tenants regarding their increased costs to maintain their HVAC systems.

It seems to be Fidelity's position that these "concessions/payments to some of [ACMP-1's] tenants regarding their increased costs…" constitutes the same as "loss of use" of ACMP-1's own property.  It is not, and this situation is not analogous to the "loss of use" damages alleged in _Woodfin_, for the following reasons:

In _Woodfin_, the Court specifically held that the Hotel was damaged by virtue of the loss of use of certain of its hotel rooms due to the failure of the HVAC system.   There is no

allegation, however, and no potential proof under the allegations in the Complaint and Amended Complaint, that ACMP-1 lost the use of property that was already occupied and presumably rented to its tenants.  There is no allegation, for example, that the tenants abandoned the property because of the condition of the HVAC system; instead, there is merely an allegation that <u>tenants</u> experienced "increased costs" as the result of the maintenance of the HVAC systems.  Even assuming that these tenants' increased costs would have constituted "loss of use" – a contention that is highly questionable – it would be loss of use by the tenants themselves, and the tenants are not parties to this suit, and have alleged no such damages.  To the contrary, the "concessions/payments" by ACMP-1 to its tenants constitute nothing more than pecuniary loss to ACMP-1, and pecuniary loss is one thing that is specifically <u>not</u> covered under Old Republic's CGL policy.

Both State Auto and Fidelity rely virtually exclusively upon the Fourth Circuit decision in <u>French v. Assurance Co. of America</u>, 448 F.3d 693 (4th Cir. 2006) to support their position in this case.  This reliance is misplaced.

In <u>French</u> the insured was a general contractor, and the negligent work of the subcontractor relating to the placement of stucco on the walls of the project resulted in damage to other parts of the project that were the separate responsibility of a another subcontractor.  In that instance, the Fourth Circuit found that the general contractor should be covered because the damaged property was unrelated to the work done by the negligent subcontractor.

In this respect, <u>French</u> may be inconsistent with an earlier decision of this Court in <u>Harbor Court Assoc. v. Kiewit Construction Co.</u>, 6 F.Supp.2d 449 (D.Md. 1998), in which Judge Garbis, of this Court, held that because a general contractor is responsible for the <u>entire</u> project, any work and any damage done to the project falls within the rule that, as a breach of the

contractual obligation of the general contractor, the damage is not covered under a typical CGL policy.  Judge Garbis noted:

> Kiewit-General contracted with HCA/Murdock to build Harbor Court….The entire project was thus Kiewit-General's responsibility….The scope of Kiewit-General's construction contract with HCA/Murdock was to erect a complete, non-defective building.  All of the work done to construct Harbor Court was either done by Kiewit-General or by a subcontractor for Kiewit-General.  Under Lerner, any defects in any part of the building would thus be "expected" by Kiewit-General, irrespective of whether the actual physical work was performed by Kiewit-General or one of Kiewit-General's subcontractors.  Therefore, with regard to Kiewit-General, the alleged damages to the brick veneer of Harbor Court were not caused by an occurrence.  Accordingly, there is no potentiality for coverage for Kiewit-General for the asserted damages and, consequently, no duty to defend.  The only damages sought from Kiewit are for the cost of repairing Harbor Court itself.  Plaintiffs have not alleged in their Consolidated Amended Complaint that anything other than the building itself has been damaged.  Even the indemnification counts do not allege injury or damage to anything other than the building itself.  Rather, they seek declaratory judgments that *if* any such injuries or damages occur, there *would be* indemnification obligations on the part of the Defendants.

6 F.Supp.2d at 457 (Emphasis in original).  The Court went on to hold that the insurer for the negligent subcontractor would be required to cover the alleged damages, because the damages were to that portion of the property that the negligent subcontractor had not contracted to provide.

As a matter of interest, the opinion in *Kiewit* does not appear to have been presented to the Court in *French*, because the *French* Court did not address it.  *Kiewit* has never been overruled, and it has been cited with approval for the principle set forth above in other jurisdictions.  See, e.g. *Nabholz Constr. Corp. v. St. Paul Fire & Marine Ins. Co.*, 354 F.Supp.2d 917, 922 (E.D.Ark. 2005); *Hotel Roanoke Conf. Ctr. v. Cincinnati Ins. Co.*, 303 F.Supp.2d 784, 787 (W.D.Va. 2004); Cf. also, *Westfield Ins. Co. v. Sheehan Constr. Co., Inc.*, 564 F.3d 817, 818 (7th Cir. 2009) ("the 'work' or 'product' of a general contractor is the whole project…").  It is

also noteworthy that the _Hotel Roanoke_ opinion was affirmed by the Fourth Circuit at 119 Fed.Appx. 451 (4th Cir. 2005).

Undoubtedly, the apparent conflict between the decisions in _French_, on the one hand, and _Kiewit_ and _Hotel Roanoke_, on the other hand, should be presented to the Fourth Circuit for an ultimate resolution, but the instant case is not the case to present it.  In this case, the underlying defendant is the subcontractor, and the subcontract obligated Fidelity to provide an entire, functional, non-defective HVAC system.  Indeed, the Complaint and the Amended Complaint specifically refer to the subcontractor's product as the "system," and it is the defectiveness of and damage to the system itself, and not to other property on the AMCP-1, LLC premises, that is the subject of damage claims in the underlying action.  Fidelity's failed contractual obligation to provide this system is the sole gravamen of the Complaint, and the only alleged damages are damage to the system.  While AMCP-1 might have alleged other property damage outside the "system," it did not do so, and it is the claim set forth in the underlying action that governs the duty to defend, and not those claims that <u>might have been</u>, but were not, alleged.  See, e.g. _Reames v. State Farm Fire & Cas. Ins. Co._, _supra,_ 111 Md.App. at 560-561, 683 A.2d at 186 (1996), where the Court of Special Appeals observed:

> From [the] cases, we glean that the analysis concerning an insurer's duty to defend a lawsuit filed against its insured on the ground that the allegations in the tort action potentially bring the tort action within policy coverage is governed solely by evaluating the cause of action actually alleged by the plaintiff in the lawsuit, along with the relevant extrinsic evidence.  This extrinsic evidence must, however, relate in some manner to a cause of action actually alleged in the complaint and cannot be used by the insureds to create a new, unasserted claim that would create a duty to defend.  Unasserted causes of action that could potentially been supported by the factual allegations or the extrinsic evidence cannot form the basis of a duty to defend because they do not demonstrate "a reasonable potential that the issue triggering coverage will be generated at trial."…

While the instant issue deals with damages rather than separate causes of action, there is absolutely no allegation of damage to any property owned by the underlying plaintiff AMCP-1 other than damage to the system itself; as noted above, the claim that AMCP-1 has had to reimburse or otherwise give consideration to its tenants because of the failure of the system does not establish separate property damage to AMCP-1's property that would support the duty to defend in the present case.

As discussed above, this case presents a situation that is substantially indistinguishable from that presented in *Woodfin Equities Corp. v. Harford Mut. Ins. Co.*, supra, and should be governed by the *Woodfin* decision in this respect. To the extent (if any) that the Fourth Circuit's decision in *French* is inconsistent with the decision in *Woodfin*, *Woodfin*, as an opinion of the Court of Special Appeals, must control as to Maryland law.


**II.   THE CLAIMS SET FORTH IN THE UNDERLYING COMPLAINT ARE EXCLUDED, IN THEIR ENTIRETY, FROM COVERAGE UNDER THE OLD REPUBLIC POLICY EXCLUSION b., PERTAINING TO "CONTRACTUAL LIABILITY."**

Old Republic's Commercial General Liability Coverage form contains a series of exclusions. Exclusion b., pertaining to Contractual Liability, states:

This insurance does not apply to:

…

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1)   That the insured would have in the absence of the contract or agreement; or

(2)   Assumed in a contract or agreement that is an "insured contract" provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely

for the purposes of liability assumed in an "insured contract", reasonable attorney's fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

(a)     Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b)     Such attorney's fees and litigation expenses are for the defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

The term "insured contract" is specifically defined in the policy (Section V – Definitions, number 9) as follows:

"Insured contract" means:

a.     A contract for a lease of premises…

b.     A sidetrack agreement;

c.     Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d.     An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e.     An elevator maintenance agreement;

f.     That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third party or organization.  Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

The Contract at issue in this case is not an "insured contract" as that term is defined in the policy, so that particular exclusion to the exception does not apply.   While the underlying

14

Contract (Document 25-4) between AMCP-1 and Fidelity does contain an indemnity agreement (Paragraph GP – 35), the underlying Complaint and Amended Complaint do not set forth a claim under that indemnity agreement, which simply requires Fidelity to indemnify AMCP-1 and Hostetter for any liability that they might incur as the result of certain enumerated types of claim by any third party arising out of Fidelity's wrongdoing.   There is no such claim here; the underlying Plaintiff AMCP-1 is a party to, or a third party beneficiary of, the contract itself.

The three Counts set forth in the Complaint and Amended Complaint, including the Count for negligence, all arise exclusively out of the contractual obligations of Fidelity to AMCP-1 and Hostetter.  In the absence of the Contract, there would be no basis for any liability on the part of Fidelity to the AMCP-1 based on the claims set forth in the Complaint and Amended Complaint, since these claims arise exclusively out of the defective condition of the HVAC system that Fidelity contracted to provide, and are limited to claims for repair and replacement of the system.

The Maryland Court of Special Appeals has recognized the validity of the "arising out of contract" exclusion, in *Chang v. Brethren Mut. Ins. Co.*, 168 Md.App. 534, 555, 897 A.2d 854, 866 (2006), a claim arising out of certain snow removal costs.  In that case, the Court of Special Appeals noted:

> Even if the snow removal costs were within "property damage," the claims against appellants came within an exclusion.  The liability coverage form excluded "'property damage' for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement."  Security and appellants entered into an express contract.  The obligation and any liability by appellants to Security arose solely because of that agreement.  As it turned out, the terms of the contract were such that appellants incurred no liability under the contract.  That does not change the fact, however, that its obligation and potential liability were contractual in nature.

15

This Court has also addressed the "contractual liability" exclusion in *M Consulting & Export, LLC v. Travelers Cas. Ins. Co.*, *supra*, 2 F.Supp.3d at 739-740.   In that case, after obtaining a default judgment against an insured supplier of sparkling wine in a State court action for breach of contract and negligence, based on the supplier's alleged failure to ensure delivery of all of the sparkling wine that the purchaser had ordered, the purchaser brought an action against the supplier's liability insurer to recover under a CGL policy.   While, as noted above, this Court found that there had been no "occurrence" to support a claim for liability under the policy, the Court also addressed the "contractual liability" exclusion, as well.   The plaintiff in that case argued that "plaintiff's loss does not arise out of any contract….Rather, the loss is an independent negligence action whereby injuries arise independent of the contract breach and relate more to services provided by [the insured] and not a contract entered into between plaintiff and [the insured].   In other words, the breach of contract is not the instrumentality of the injury and the negligence is not the event further back in the sequence of events ending with or including excluded liability under the policy."   2 F.Supp.3d at 740.   This Court rejected plaintiff's position, however, and noted:

> Nevertheless, plaintiff's characterization of the suit is not dispositive of this matter.   As this Court has previously noted, under Maryland law, the theory of liability employed by the plaintiff does not affect the analysis….See *Insights Trading Group [v. Federal Ins. Co.]*, 2010 WL 2696750, at 5 ("courts have found that litigants cannot skirt around an exclusion clause merely by relying upon certain alternative theories; indeed, an exclusion clause must apply 'irrespective of the theory of liability by which [the claimant] seeks redress for his injury, as the ["arising out of"] policy exclusion is not concerned with theories of liability.'"….Rather, the main focus is the "instrumentality of the injury."…The exclusion at issue here is directed at an injury arising from the deficient performance of a contract.   As noted above, despite plaintiff's characterization of this action as one involving negligence, the loss for which plaintiff seeks to recover is the result of [the insured's] failure to perform under the contract….

2 F.Supp.3d at 740.

16

Of course, the same acts or omissions may constitute both torts and breaches of contract. However, this does not preclude the application of the "contractual liability" exclusion unless the negligence claims are separate and distinct, and not arising from the breach of contract itself. Maryland case law has long recognized the existence of tortious misconduct arising out of breach of contract, see, e.g. *Marlboro Shirt Co. v. American District Telegraph Co.*, 196 Md. 565, 571-572, 77 A.2d 766, 778 (1951). While the strict rule requiring privity of contract to support a tort claim arising out of breach of contract has been substantially relaxed in the context of claims by third parties, see, e.g. *Council of Unit Owners v. Whiting-Turning Contracting Co.*, 308 Md. 18, 29-36, 517 A.2d 336, 342-345 (1986), the case law still recognizes that the basis for the tort duty in such a case arises from the contractual relationship itself. Compare, e.g. *Miller v. Schaffer*, 80 Md.App. 60, 74, 559 A.2d 813, 819-820 (1989) ("the defective performance of a contractual undertaking may give rise to an action both in tort or in contract..."). In the present case, of course, the alleged tort liability of Fidelity could only arise, exclusive, out of the contract between Fidelity and Hostetter; the entire gravamen of the claim by AMCP-1 is predicated upon the duties imposed by that contract.

III.   **THERE IS NO DUTY TO DEFEND BECAUSE THE ALLEGED DAMAGES FALL WITHIN THE "DAMAGE TO YOUR WORK" EXCLUSION IN THE OLD REPUBLIC COMMERCIAL GENERAL LIABILITY POLICY.**

The Old Republic policy, like most Commercial General Liability policies, includes a specific "builder's risk" exclusion relating to "Damage to Your Work", Exclusion l. (Policy, page 5 of 16). The exclusion specifically provides:

This insurance does not apply to:

l.        Damage to Your Work

"Property damage" to "your work" arising out of it or any part of it and included in the "products – completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

The term "your work" is defined in the policy (Page 16 of 16, Definition 22), as:

"Your work":

a.     Means:

     (1)     Work or operations performed by you or on your behalf; and

     (2)     Materials, parts or equipment furnished in connection with such work or operations.

b.     Includes:

     (1)     Warranties or representations made by anyone with respect to the fitness, quality, durability, performance or use of "your work", and

     (2)     The providing of or failure to provide warnings or instructions.

The term "products – completed operations hazard" is also defined in the policy, definition 16, page 15 of 16.  Without quoting the entire definition, because the work at issue in this case had been completed, but still needed "service, maintenance, correction, repair or replacement," there should be no question that the work at issue falls within the "products – completed operations hazard."

The "subcontractor's exception" to the "your work" exclusion was added to the Insurance Services Organization form CGL policies in 1986, as discussed in *French v. Assurance Co. of America*, supra, 448 F.3d at 706.  Quoting from a Kansas decision, *Lee Builders, Inc. v. Farm Bureau Mut. Ins. Co.*, 33 Kan.App.2d 504, 103 P.3d 997, 1003 (2005), the Court observed:

"If the policy's exclusion for damage to the insured's work contains a proviso stating that the exclusion is inapplicable if the work was performed on the insured's behalf by a subcontractor, it would not be justifiable to deny coverage to the insured, based upon the absence of an occurrence, for damages owed because

of property damage to the insured's work caused by the subcontractor's work. Reading the policy as a whole, it is clear that the intent of the policy was to cover the risk to the insured created by the insured's use of a subcontractor. Moreover, if the coverage were never available for damage to the insured's work because of a subcontractor's mistake, on the theory that there was no occurrence even under those circumstance, the foregoing subcontractor proviso to the exclusion for damage to the insured's work would be meaningless, and if possible, policies should not be interpreted to render policy provisions meaningless.

The Court made it clear, however, that "we will reiterate our holdings. We hold then, under Maryland law, a standard 1986 Commercial General Liability policy form published by the ISO does not provide liability coverage to a general contractor to correct defective workmanship performed by a subcontractor. We also hold that, under Maryland law, the same policy form provides liability coverage for the cost to remedy unexpected and unintended property damage to the contractor's otherwise non-defective work-product caused by the subcontractor's defective workmanship. With respect to this last holding, we assume *arguendo* that no other policy exclusion applies." Id.

The situation here, however, is unlike that in *French* with regard to the "your work" exclusion. The key difference is emphasized by the language of the "subcontractor exception" itself, which states: "This exclusion does not apply if the damaged work or the work out of which the damage arises <u>was performed on your behalf by a subcontractor</u>." (Emphasis added). The operative fact here, under the allegations in the Third-Party Complaint against Hydro-Logic, Inc. (Document 25-5) is that the alleged damages occurred because Hydro-Logic **did not perform work**.

In the Third-Party Complaint the following pertinent allegations are set forth on page 2:

…Plaintiff claims that the pipes and equipment in the HVAC system have and will continue to fail due to the failure of Third Party Plaintiff [Fidelity] to implement a water treatment system after the building was constructed.

2.      Third Party Plaintiff denies that the HVAC equipment and pipes have and will fail due to the implementation of a water treatment system.  Further, Third Party Plaintiff has asserted other valid defenses to the claims asserted by the Plaintiff, including the defense that Plaintiff's claims are barred by the applicable statute of limitations.

3.      Third Party Plaintiff had retained Third Party Defendant Hydro-Logic, Inc. to provide water treatment chemicals and services for the HVAC system at the building start-up and for one year after the date the building was completed.  <u>On information and belief, Third Party Defendant did not provide the services for which it had contracted with Third Party Plaintiff to perform.</u>

(emphasis added).

Thus, it is plainly alleged in the Third Party Complaint by AMCP-1 that the "damaged work or the work out of which the damage arises" was <u>not</u> performed by the subcontractor.  The allegation is that the subcontractor failed to perform work, not that the subcontractor performed defective work.

Maryland law relating to the interpretation of words in an insurance contract is clear:

Construction of insurance contracts in Maryland is governed by a few well-established principles.  An insurance contract, like any other contract, is measured by its terms unless a statute, a regulation, or public policy is violated thereby….To determine the intention of the parties to the insurance contract, which is the point of the whole analysis, we construe the instrument as a whole….Maryland courts should examine the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution.

<u>In so doing, we accord words their ordinary and accepted meanings.  The test is what meaning a reasonably prudent layperson would attach to the term….</u>

<u>Pacific Indemn. Co. v. Interstate Fire & Cas. Co.</u>, 302 Md. 383, 388, 488 A.2d 486, 488 (1985) (citations omitted; emphasis added).   In the present case, the words of the "subcontractor exception" are unequivocal, and subject to one interpretation:  The exclusion does not apply if, <u>and only if</u>, the damaged work, or the work out of which the damage arises was <u>performed</u> on the

20

contractor's behalf by a subcontractor.  Where the subcontractor, for whatever reason, did not perform the necessary "work," the exception, by its own terms, has no application.

Once again, the underlying Third Party Plaintiffs, in their Third Party Complaint, might conceivably have alleged that Hydro-Logic actually performed "work" on the HVAC system, and that work was negligently performed.  However, AMCP-1, as Third Party Plaintiff, did not make this allegation, and under the *Reames* analysis, set forth above, inasmuch as no allegation of this sort exists, it cannot be the basis for a claim of potential coverage.

Finally, as discussed in the previous portions of this Motion and Memorandum, Fidelity Engineering was itself the subcontractor; Fidelity had a contractual obligation to provide a functioning, non-defective HVAC system, and the allegations in the underlying Complaint and Amended Complaint are exclusively to the effect that Fidelity failed in this contractual obligation.  There is no contention whatsoever in either the Complaint or the Amended Complaint, that work done by Hydro-Logic caused damage to any part of the AMCP-1 property that was not a part of the HVAC system, or not included within the requirements of the contract requiring Fidelity to install the HVAC system.  Indeed, it is the foremost allegation in the Complaint that Fidelity was obligated under the Contract to do these things, and failed to do them. This is not a situation, as in *French*, where work of one subcontractor damaged the otherwise non-defective work of a different subcontractor.  Here, Fidelity, as subcontractor, allegedly delegated its own contractual obligation to provide water treatment chemicals and services to a sub-subcontractor, and the sub-subcontractor failed to provide these services.  If true, Hydro-Logic's failure did not relieve Fidelity of its own contractual obligation to ensure that water treatment chemicals and services were provided under its contract with Hostetter.

<u>C</u>ONCLUSION

For all of the foregoing reasons, it is respectfully requested that (a) summary judgment be granted in favor of the Defendant, Old Republic Insurance Company, that the allegations in the Complaint and the Amended Complaint in the underlying action do not give rise to coverage or a duty to defend under the Old Republic policy; and (b) the Motions for Partial Summary Judgment filed herein by State Automobile Mutual Insurance Company and Fidelity Engineering Corporation be denied.

Respectfully submitted,

MORGAN CARLO DOWNS & EVERTON P.A.

_/s/ Angus R. Everton_____
Angus R. Everton (Bar I.D. # 01797)
Executive Plaza III, Suite 400
11350 McCormick Road
Hunt Valley, Maryland 21031
Phone:  (410) 584-2800
Fax:  (410) 584-2020
areverton@morgancarlo.com
*Attorneys for Defendant,*
   *Old Republic Insurance Co.*